COMMONWEALTH vs. BRUCE W. ANDERSON.

Worcester.  November 3, 1986. — December 18, 1986.

Present: HENNESSEY, C.J., WILKINS, NOLAN, LYNCH, & O'CONNOR, JJ.

*Homicide. Constitutional Law, Assistance of counsel. Practice, Criminal, Assistance of counsel. Witness, Expert.*

At the trial of a first degree murder indictment, defense counsel's failure to present testimony by a psychiatrist and a psychologist after having told the jury in his opening statement that he would do so did not deprive the defendant of his constitutional right to effective assistance of counsel, where, although the experts' testimony might have persuaded the jury to return a verdict of murder in the second degree rather than in the first degree, their testimony would have disclosed information about the defendant which would have reduced the likelihood of the jury's returning a voluntary manslaughter verdict, and the possibility of such a verdict during trial was not manifestly unreasonable. [843-844]

INDICTMENT found and returned in the Superior Court Department on November 16, 1983.

The case was tried before *Robert V. Mulkern,* J.

*Stephen Hrones* for the defendant.

*Claudia R. Sullivan,* Assistant District Attorney, for the Commonwealth.

WILKINS, J. The defendant, convicted of murder in the first degree of his wife, contends that, because he was denied his constitutional right to the effective assistance of counsel, he is entitled to a new trial. Through new counsel on appeal, he argues that his trial counsel failed to present helpful expert testimony concerning his state of mind at the time he stabbed his wife to death. We consider this claim and, acknowledging our duties under G. L. c. 278, § 33E (1984 ed.), affirm the judgment.[1]

[1] The defendant was also convicted on two indictments charging breaking and entering, one charging assault with a dangerous weapon, and one charging assault and battery by means of a dangerous weapon. His appeal does not challenge these convictions.

About 4 A.M. on July 27, 1983, in Worcester the defendant forced his way into the second-floor apartment of his estranged wife, who had given birth to their child about six weeks earlier. He discovered a partially clothed man in the bedroom, chased him from the apartment building, but did not catch him. The defendant returned upstairs, with a knife he had taken from the pantry, and pursued his wife to a third-floor apartment where she had sought refuge and had telephoned the police. He forced his way in, slashed one occupant of the third-floor apartment, and assaulted another. He repeatedly stabbed his wife, while the occupants of the third-floor apartment helplessly watched. The police recorded part of the conversation between the defendant and the victim. The defendant left the apartment, but approximately thirty seconds later he returned, stabbed her several more times, and fled. He turned himself into the police later that morning.

We have said that, if the State standard for measuring the effectiveness of counsel in a constitutional sense is met, the Sixth Amendment test expressed in *Strickland* v. *Washington,* 466 U.S. 668 (1984), is also necessarily met. *Commonwealth* v. *Fuller,* 394 Mass. 251, 256 n.3 (1985). A defendant claiming ineffective assistance of counsel must show both (a) a serious incompetency, inefficiency, or inattention of counsel and (b) that counsel's conduct deprived the defendant of something substantial that was likely to have made a difference in the result. See *Commonwealth* v. *Satterfield,* 373 Mass. 109, 115 n.10 (1977); *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974). Where, as here, trial tactics are challenged, a defendant must show that the choice made by counsel was "manifestly unreasonable." *Commonwealth* v. *Adams,* 374 Mass. 722, 728 (1978). See *Commonwealth* v. *Doucette,* 391 Mass. 443, 458 (1984); *Commonwealth* v. *Levia,* 385 Mass. 345, 353 (1982); *Commonwealth* v. *Boutwell,* 21 Mass. App. Ct. 201, 209-210 (1985).

In his opening statement to the jury, made after the Commonwealth had rested, defense counsel told the jury that he would present testimony from both a psychiatrist and a psychologist to show that "[w]ithout feeling, without any appreciation for

the enormity of what was happening, [the defendant] on that night was like a robot programmed on destruction." Defense counsel then presented several witnesses who testified to circumstances arguably sympathetic to the defendant. Many of these matters, at least in general terms, were also noted in the reports the defendant's announced experts had furnished to defense counsel. There were only a few background facts in the reports possibly helpful to the defendant which did not come out at trial.[2]

There was a history of stormy relations between the victim and the defendant, even while they were living together before they were married. There was evidence tending to show the following facts. The victim started many of their arguments, which concerned the defendant's lack of employment and his use of drugs. The defendant, a high-strung person, felt that his wife never left him alone, and he became nervous, depressed, and upset by their arguments. His wife would not let him use her car to go to school, and he had to drop out. His mother and an aunt had recently been hospitalized for injuries received in a motor vehicle accident. He owned a three-family house that faced foreclosure; rent receipts were insufficient to cover his mortgage obligations. The unwanted baby added stress to the marriage because the victim, a registered nurse, had been supporting them before the child was born.

There was negative information about the defendant in each expert's report, information which was not otherwise before the jury and would most likely have been, if the author of each report had testified. For example, the clinical psychologist's report, based in large measure on the defendant's statements to him, showed that the defendant started drinking at age thirteen and shortly began to experiment with various other drugs. His friends during his teenage years were chiefly motorcycle club members, with whom he was occasionally in trouble with the law. His first wife, whom the psychologist interviewed, reported that they lived together for two years after their divorce

---

[2] Neither report supported use of a defense of lack of criminal responsibility, and the psychiatrist expressly disclaimed that possibility.

and that "on one occasion following their divorce, he found her in bed with another man and he became angered to the point of beating her and the man." After the end of that relationship, the defendant moved to California where he fathered a child by a woman with whom he had a serious relationship. After his return from California and his marriage to the victim, she obtained a restraining order against him. His drug use increased. The psychiatrist's report recounted an arrest record, including convictions for possession of drugs and for disorderly conduct. It also stated that, once back in Massachusetts, he continued to inject cocaine "and used to support this habit by dealing in the drug himself."

The defendant rested without calling either of the experts his counsel had told the jury would testify. Both the prosecutor and the judge expressed surprise. Defense counsel disclaimed interest in a jury instruction based on *Commonwealth* v. *Gould,* 380 Mass. 672 (1980).[3] He explained to the jury, early in his final argument, his reason for not calling the two experts. He told the jury in effect that the experts' testimony was not needed.[4]

What the jury did not hear was the psychiatrist's opinion that, when the defendant saw his wife apparently physically involved with another man who escaped the defendant's pursuit, the defendant was overwhelmed with rage and "in an impulsive fashion without any conscious deliberation" stabbed his wife to death. If that evidence, the admissibility of which is not questioned, had been presented, it would have been relevant as

---

[3] The *Gould* opinion held that the effect of a defendant's mental illness could be considered in determining whether he had the capacity for deliberate premeditation (*id.* at 681) and in determining whether the defendant committed murder with extreme atrocity or cruelty (*id.* at 685-686).

[4] He said: "And I have been sitting and listening with you as the facts have been presented in this case, and I had intended to try and persuade you with fancy medical and clinical terminology. But there is no amount of psychiatric and psychological evaluations that were going to present a better picture of what you have already heard. Why should you hear this evidence again from people who presume to know Bruce Anderson better than those who really do know him and testified what they already know? At this point was it really necessary for me to try and impress you?"

to the effect of the defendant's mental state on (a) whether he committed murder with extreme atrocity or cruelty and (b) his capacity to act (and whether he did act) with deliberate premeditation, a question of the defendant's subjective state of mind. The psychiatrist's opinion might have raised a reasonable doubt sufficient to persuade the jury to return a verdict of murder in the second degree rather than in the first degree. Viewed solely in terms of the prospects of a verdict of murder in the second degree rather than a verdict of murder in the first degree, the decision not to present expert testimony appears unreasonable.[5]

The defendant's tactical considerations were not, however, that narrowly limited. He hoped for, and defense counsel urged the jury to return, a manslaughter verdict and, on the evidence, the question of voluntary manslaughter, an intentional killing in the absence of malice, was for the jury. If on the evidence there is a reasonable doubt whether a killing, although intentional, occurred in a circumstance likely to produce in an ordinary person a state of passion or anger that would eclipse his capacity for reflection or restraint and if that is what in fact happened, there would be no malice and only a voluntary manslaughter verdict, not a murder verdict, would be permissible. See *Commonwealth* v. *McLeod,* 394 Mass. 727, 738, cert. denied sub nom. *Aielio* v. *Massachusetts,* 474 U.S. 919

---

[5] The trial judge in denying the defendant's motion for postconviction relief stated that, if the psychiatric testimony had been presented to the jury, a *Gould* charge would have been mandated, that is, a charge stating that a defendant's mental impairment may preclude him from being able deliberately to premeditate or to commit murder with extreme atrocity or cruelty. *Commonwealth* v. *Gould,* 380 Mass. 672 (1980). The *Gould* case involved a defendant with mental impairment, a long-standing mental illness. *Id.* at 676-677.

This case is only analogous to the *Gould* case. The psychiatrist's testimony would have supported the conclusion that the defendant killed in an impulsive fashion without conscious deliberation. That testimony would have been relevant on the question whether the Commonwealth proved beyond a reasonable doubt that the defendant killed with extreme atrocity or cruelty or with "the specific intent required for murder in the first degree based on deliberate premeditation." *Commonwealth* v. *Gould, supra* at 682. An instruction, on request, that the jury should consider all the evidence in determining the defendant's state of mind and in determining whether he intended a particular result would have sufficed.

(1985); *Commonwealth* v. *Walden,* 380 Mass. 724, 727-728 (1980). But it is well established that a defendant's passion or anger in response to provocation must be measured on the objective standard of whether an ordinary person would probably have been so provoked. *Commonwealth* v. *McLeod, supra. Commonwealth* v. *Amaral,* 389 Mass. 184, 188-190 (1983). *Commonwealth* v. *Walden, supra* at 728. *Commonwealth* v. *Bermudez,* 370 Mass. 438, 441-442 (1976). *Commonwealth* v. *Webster,* 5 Cush. 295, 307 (1850).

The expert testimony not presented to the jury, therefore, would not have significantly helped the defendant, and probably would have hurt him, in his attempt to obtain a manslaughter verdict. Neither the psychiatrist nor the psychologist would have been permitted to give an opinion on whether the defendant acted on reasonable provocation. That was a question for the jury on an objective standard which the jury were capable of applying. The defendant's subjective reaction, so crucial in deciding whether he killed with deliberate premeditation, and relevant in deciding whether he killed with extreme atrocity or cruelty (see *Commonwealth* v. *Gould, supra* at 684-685) was irrelevant in deciding whether the provocation was reasonable, tested by what an ordinary person's response would have been in the circumstances.[6] Substantially all the background facts in the experts' reports arguably favorable to the defendant on the manslaughter question were in evidence from other sources. The risk of the disclosure of negative information in those reports was substantial if the experts had testified. Defense counsel had a tactical choice to make: whether to present an expert opinion that might raise a reasonable doubt on premeditation and extreme atrocity and cruelty at the risk of the disclosure of unfavorable information that would reflect adversely on the defendant and make less likely a sympathetic manslaughter verdict. Certainly expert testimony was not required in order to make the argument to the jury that the de-

---

[6] The experts' testimony would have been relevant on the manslaughter question only to the extent that it would have tended to establish that the defendant did react in the heat of passion.

fendant reacted in the heat of passion as an ordinary person probably would have.

The decision not to present the expert testimony was a tactical one that was not "manifestly unreasonable," when made. *Commonwealth* v. *Adams,* 374 Mass. 722, 728 (1978). See *Commonwealth* v. *Sielicki,* 391 Mass. 377, 379 (1984). Defense counsel might have been better advised not to have announced that he was going to present expert testimony, but his explanation to the jury as to why he changed his mind (see n. 4 above) has a plausible ring to it.[7]

*Judgment affirmed.*

---

[7] The experienced trial judge assessed the tactical choice to emphasize a potential manslaughter verdict and concluded that it was not manifestly unreasonable. He noted that a not guilty verdict was most unlikely. The psychiatric evidence, he said, would have greatly helped toward a second degree verdict. He noted, however, that a manslaughter verdict would have benefited the defendant in the likely length of the sentence to be served relative to the sentence to be served on a conviction of murder in the second degree more than the difference between the time likely to be served on a conviction of murder in the first degree and a conviction of murder in the second degree.