2024 IL App (1st) 230386-U

FIFTH DIVISION
November 8, 2024

No. 1-23-0386

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 CR 103501 |
| | ) | |
| DARRYL K. SMITH, | ) | Honorable |
| | ) | Gregory Paul Vasquez, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

PRESIDING JUSTICE MIKVA delivered the judgment of the court.
Justice Navarro concurred in the judgment.
Justice Oden Johnson dissented.


**ORDER**

¶ 1   *Held*:   Defendant's conviction for delivery of a controlled substance is affirmed where he failed to demonstrate that he received ineffective assistance of trial counsel.

¶ 2   Following a jury trial, defendant Darryl K. Smith was convicted of one count of delivery of a controlled substance weighing between 1 and 15 grams and was sentenced to 16 years in prison. Mr. Smith now appeals, on the grounds that he received ineffective assistance of trial counsel. Mr. Smith argues that his counsel's performance was deficient where he (1) abruptly ceased cross-examining a witness after becoming "flustered" while trying to impeach her during a

pretrial hearing, (2) made an unfulfilled promise in opening statements that he would present alibi evidence, and (3) elicited "damning" testimony on cross-examination during the trial.

¶ 3    For the following reasons, we affirm.

¶ 4                                I. BACKGROUND

¶ 5    On October 7, 2020, police conducted an undercover operation to buy $200 worth of heroin. During the transaction, which lasted approximately 20 seconds, Investigator Kimberly Brown, undercover, handed $200 in prerecorded funds to a man who identified himself as "Duck" in exchange for four small packets of heroin. No one was arrested at the time of the operation. On December 10, 2020, Mr. Smith was arrested and charged with delivery of between 1 and 15 grams of heroin based on this transaction. The prerecorded funds were not recovered.

¶ 6    The day before the trial began, the State filed a pretrial motion to admit the lay opinion identification testimony of Investigator Brown. During the hearing on that motion, Investigator Brown testified on direct examination that she could recognize Mr. Smith at the upcoming trial because she knew him from executing a search warrant on his home. She testified that, on July 13, 2020, she was employed by the Cook County Sheriff's office and had worked with the Maywood Police Department to execute that search warrant. On cross-examination and redirect examination, Investigator Brown explained that her preparations for the search included a review of photographs of Mr. Smith and that during the execution of the search warrant, she directly observed him from a close distance.

¶ 7    On recross-examination, defense counsel asked Investigator Brown about police reports involving Mr. Smith that she reviewed prior to testifying at that hearing. Specifically, defense counsel asked Investigator Brown whether she noted the duration of her encounters with Mr. Smith in the reports and whether she noted that she observed him "for only 2 minutes." After objection,

the court asked counsel to specify which report he was referring to because there were multiple reports tendered in discovery. Defense counsel attempted to clarify, and the State objected again, stating, "I don't know what report he's talking about. I don't know what month he's talking about." Defense counsel replied, "I'm flustered by the State. I'm not going to ask any more questions."

¶ 8    The trial court granted the State's motion to admit the identification testimony, finding there was sufficient observation of Mr. Smith by Investigator Brown to allow that testimony into evidence.

¶ 9    The jury trial began on May 3, 2022. The State promised to show that Mr. Smith sold four bags of heroin to Investigator Brown during the undercover operation. In his opening statement, defense counsel argued that the charge was based on a "very flawed identification procedure." Defense counsel highlighted the lack of DNA evidence, fingerprints, or detailed description of Mr. Smith in the corresponding police reports and stated, "I think the evidence will show that Mr. Smith was not there" and "I think that you're going to be interested in the evidence as it comes forth from the stand."

¶ 10    The State first called Investigator Brown as a witness. She testified that she and her team initiated the October 7, 2020, undercover operation by placing a phone call to a male individual and asking him if he "was good for H," a street term for heroin. After they discussed price and quantity, the individual directed Investigator Brown to the corner of the 3100 block of St. Charles Road in Bellwood, Illinois. When Investigator Brown arrived, she called the same telephone number to say she was there and watched an individual exit a nearby building and approach her vehicle, where he identified himself as "Duck," and she handed him $200 through the driver's-side window in exchange for four small bags. Investigator Brown later identified "Duck" as the defendant in this case, Mr. Smith. During her direct examination she explained that she knew him

from "prior contact" but did not disclose to the jury the fact that she had executed a search warrant on his home.

¶ 11    On cross-examination, defense counsel asked Investigator Brown who the telephone number she called was registered to, if she knew. The State's objection was overruled, and Investigator Brown responded that the number was registered to Mr. Darryl Smith. Counsel then pressed her on how she knew that, and she responded that it was part of the information that she and her team learned from their initial workup of Mr. Smith as a target on the buy. Over the State's objection, defense counsel also asked, "Do you know whether or not Mr. Smith was on GPS that day?" Investigator Brown replied that she did not.

¶ 12    Maywood Police Department Detective Benjamin Martinez testified that he was assigned to the Cook County Sheriff's office narcotics unit and that he also helped plan the October 7, 2020, operation and was present on the day it was conducted. Detective Martinez observed the operation from a separate undercover vehicle less than a half block away from Investigator Brown's vehicle. Detective Martinez testified that he observed Mr. Smith for about a minute. He identified Mr. Smith in court as the person he saw conduct the transaction with Investigator Brown. On cross-examination, Detective Martinez testified that he also knew Mr. Smith from "prior contacts."

¶ 13    The trial court denied defense counsel's motion for a directed verdict. Mr. Smith did not testify, and the defense did not call any witnesses. During closing argument, the prosecution stressed that Mr. Smith was identified by two police officers. Defense counsel stressed the delay between the buy and Mr. Smith's arrest, the fact that there was no physical evidence tying his client to the sale, including the fact that the prerecorded funds were not recovered and no recordings were made of the telephone calls. Counsel also stressed that the identifications were unreliable since Detective Martinez was half a block away and neither officer had written down

any description of Mr. Smith or could even say whether he was on GPS that day.

¶ 14    The jury found Mr. Smith guilty of the delivery of between 1 and 15 grams of heroin. The presentence investigation report indicated that Mr. Smith had a lengthy criminal record, including nine prior adult convictions, many of which were narcotics related, but one of which was for second degree murder, and the trial court sentenced him to 16 years in prison.

¶ 15    Mr. Smith now appeals.

¶ 16                                    II. JURISDICTION

¶ 17    Mr. Smith was sentenced on June 22, 2022, and the court denied his motion to reconsider that sentence on November 29, 2022. Mr. Smith timely filed his notice of appeal the same day. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 18                                    III. ANALYSIS

¶ 19    Mr. Smith's sole argument on appeal is that he received ineffective assistance of trial counsel. Specifically, Mr. Smith argues that his counsel's performance was deficient where he (1) abruptly concluded his cross-examination of Investigator Brown during the pretrial motion hearing after becoming "flustered" while trying to impeach her, (2) made an unfulfilled promise in his opening statement that he would present alibi evidence, and (3) elicited damaging testimony from witnesses regarding Mr. Smith's connection to the phone number involved in the undercover operation and his prior contacts with police.

¶ 20    The United States and Illinois constitutions guarantee criminal defendants the right to effective assistance of counsel. U.S. Const. amends. VI, XIV; Ill. Const. 1970, art. I, § 8. To establish a claim of ineffective assistance of counsel, a defendant must satisfy the two-prong test

set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). That test requires a showing of (1) counsel's deficient performance and (2) prejudice stemming from that deficiency, such that the defendant was deprived of a fair trial. *Id*. at 687-88. In reviewing a claim of ineffective assistance of counsel, a court must consider defense counsel's performance as a whole and not merely focus upon isolated incidents of conduct. *People v. Redmon*, 2022 IL App (3d) 190167, ¶ 19. If defendant fails to prove either prong of this test, his ineffective assistance claim fails. *Id*. at 697. Courts may dispose of an ineffective assistance of counsel claim by proceeding directly to the prejudice prong, without addressing whether counsel's performance was deficient. *People v. Hale*, 2013 IL 113140, ¶ 17.

¶ 21     To establish prejudice, the defendant must show with a reasonable probability that, absent counsel's alleged error, the trial's outcome would have been different. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Put another way, the defendant must demonstrate "that counsel's deficient performance rendered the result of the trial unreliable or fundamentally unfair." *Id*. We review claims of ineffective assistance of counsel *de novo*. *People v. Demus*, 2016 IL App (1st) 140420 ¶ 21.

¶ 22          A. Counsel Did Not Provide Ineffective Assistance at the Pretrial Hearing

¶ 23     Mr. Smith is unable to demonstrate prejudice stemming from trial counsel's performance at the pretrial hearing because it is apparent that the court would have granted the State's motion to admit the identification testimony of Investigator Brown, even if Mr. Smith's counsel had been more successful in impeaching her with her prior statements in a police report. Mr. Smith correctly contends that an attorney's failure to lay the foundation to admit relevant evidence can constitute ineffective assistance of counsel. *People v. House*, 141 Ill. 2d 323, 388-89 (1990). Mr. Smith also correctly points out that, while police reports are generally inadmissible as evidence, they may be

used to impeach a witness. *Kocisak v. Kelly*, 2011 IL App (1st) 102811, ¶ 25. But Mr. Smith fails to establish that any of the contents of the police report his trial counsel was attempting to lay a foundation for would have so undermined Investigator Brown's testimony that the court would likely have barred her identification of Mr. Smith.

¶ 24     Mr. Smith argues that the police report is impeaching because Investigator Brown failed to include in it the duration of her encounter with Mr. Smith in July 2020 or a sufficient description of him. He argues:

> "[W]hile the State is correct that [Investigator] Brown acknowledged on cross-examination that she did not memorialize the description of the offender in the police report, [she] testified to the opposite on re-direct, where she claimed that she *did* provide in the report a description of the offender's height, weight, and ethnicity." (Emphasis in original.)

¶ 25     Investigator Brown did initially deny making a written description of the individual targeted in the undercover operation. However, she subsequently testified that she did include general details about him, such as gender, height, weight, and ethnicity. The report itself is not in the record, but this simple clarification is, in our view, not something that would have allowed defense counsel to use the report for any significant impeachment. Mr. Smith's argument about using the report ignores the context of Investigator Brown's testimony at the pretrial hearing. The purpose of the pretrial hearing was simply to determine whether Investigator Brown had sufficient prior contact with Mr. Smith to reliably identify him at trial. Throughout her testimony, she was consistent and confident that she was able to accurately identify Mr. Smith. Investigator Brown testified that she had received a briefing on Mr. Smith that included photographs and residency documents and had then later executed a search warrant at his home, where she directly observed him. Whether she recorded in her report specific characteristics like his haircut or facial hair, or

7

only more general physical descriptors, does not detract from her ability to identify Mr. Smith based on her previous experience in executing a warrant for his arrest. There is no reasonable probability that counsel's failure to impeach Investigator Brown with the report changed the court's ruling on the pretrial motion and thus this claim of ineffective assistance fails to satisfy the prejudice prong of the *Strickland* test.

¶ 26    B. Defense Counsel Did Not Make an Unfulfilled Promise in His Opening Statement

¶ 27    Mr. Smith next argues that his counsel made a promise in his opening statement to provide alibi evidence and that counsel's failure to later establish any alibi therefore constituted ineffective assistance. We disagree.

¶ 28    While it is true that trial counsel may be deemed ineffective if they promise a particular witness will testify but fail to deliver that testimony at trial (*People v. Ligon*, 365 Ill. App. 3d 109, 120 (2006)), that is not what happened here. Mr. Smith's counsel began his opening statement by arguing that the State's case was based on "a very flawed identification procedure." Counsel then highlighted the lack of DNA evidence, fingerprints, or description of the suspect in the police report. He continued, "*I think the evidence will show* that Mr. Smith was not there" and "I think you're going to be interested in the evidence as it comes forth from the stand." (Emphasis added.) Mr. Smith argues that had his counsel only intended to raise an argument that the evidence was insufficient, he would not have gone on to make this promise and would have simply explained to the jury that the evidence would not prove beyond a reasonable doubt that he committed the offense.

¶ 29    We agree with the State, however, that counsel's primary focus in his opening statement was to challenge the sufficiency of the evidence and that this challenge did not constitute a promised alibi defense. Counsel walked the jury through various forms of evidence that were

missing from this case to cast doubt on the claim that Mr. Smith was the individual who sold heroin to Investigator Brown during the October transaction. The statement counsel made contains no express promise and lacks any explicit mention of an alibi defense.

¶ 30    Because there is no mention of a specific alibi or any other exonerating testimony, counsel's statement is distinguishable from the unfulfilled promises made in the cases on which Mr. Smith relies. For example, in *People v. Briones*, 352 Ill. App. 3d 913, 918 (2004), defense counsel promised that the defendant would give a statement that he was not there, but no such statement was introduced at trial. Similarly, in *Hampton v. Leibach*, 347 F. 3d 219 (7th Cir. 2003), counsel was found deficient where he did not fulfill two promises: (1) that the defendant would testify that he was present at the concert where the crime took place and witnessed the attack but was otherwise not involved and (2) that the evidence would show that the defendant had no affiliation with any gang. Similarly, in *Anderson v. Butler*, 858 F.2d 16 (1st Cir. 1998), counsel promised to call a psychiatrist and a psychologist who would testify that the defendant was not conscious when the crime was committed.

¶ 31    In each of these cases, there was a specific promise that the defendant or some other witness would provide exonerating testimony that created an expectation in jurors that prejudiced the defendant when that promise was not fulfilled. No such expectation was created here where counsel's statement did not promise that Mr. Smith or any other individual would testify that he was elsewhere during the October operation. Rather than make a promise, counsel stated that he believed the evidence would demonstrate that his client was not the individual who sold drugs to Investigator Brown, a statement that was consistent with defense counsel's efforts throughout the trial to elicit testimony that called into questioned the identification of Mr. Smith as the person who sold the heroin.

¶ 32          C. Counsel's Questions and the Testimony He Elicited

were Insufficient to Show Prejudice

¶ 33    Mr. Smith argues that his trial counsel also provided ineffective assistance by inquiring about his (1) phone number and registration, (2) past contacts with police, and (3) status on electronic monitoring. Even if some of this information may have been unhelpful to the defense, Mr. Smith cannot show that, but for this testimony, the outcome of the case was likely to be different. He thus cannot meet the prejudice prong of the *Strickland* standard.

¶ 34    Mr. Smith argues that his counsel asking Investigator Brown if she knew whether Mr. Smith was on electronic monitoring on the day of the operation painted him as a criminal in the eyes of the jury. However, as the State points out, Investigator Brown's response that she did not know whether he was on electronic monitoring undermines any claim that this question prejudiced Mr. Smith in the jurors' eyes. In fact, defense counsel was able to use this in closing argument, by pointing out the investigator could not even say whether the person who made the sale was on electronic monitoring.

¶ 35    Similarly, Mr. Smith argues that his counsel's elicitation from Detective Martinez that he recognized Mr. Smith from "prior contacts" further painted him as a criminal. But it was already established, through the State's direct examination, that Investigator Brown knew Mr. Smith from prior police contact. Additional testimony that Detective Martinez also had prior contact with Mr. Smith was cumulative. The jury already knew that Mr. Smith was known to the police prior to this October 2020 operation to buy heroin from him. There is no reasonable probability that, without this additional fact, the result of this trial would have been different.

¶ 36    The most convincing of Mr. Smith's arguments is that he was prejudiced by his counsel's question on cross-examination that brought out the information that the cell phone number that

was called to set up the buy was registered to him. As Mr. Smith points out, the jury was likely to assume that the owner of a cell phone was the person who answered the call, while Investigator Brown had only identified the person on the phone as a male.

¶ 37    While this additional testimony may have been unhelpful to the defense, it did not establish nor was it key to a necessary element of the State's case. Mr. Smith was charged with and directly observed by two police officers making the narcotics sale. It was not necessary for the State to show that he was also the person who arranged for the sale by phone. That makes this case different than *People v. Jackson*, 318 Ill. App. 3d 321, 328 (2000), and *People v. Bailey*, 374 Ill. App. 3d 608 (2007), the cases that Mr. Smith relies on, or *People v. Orta,* 361 Il. App. 3d 342 (2005), relied on by the dissent. In those cases, the testimony elicited by defense counsel actually established an element of the State's case or was key to convicting the defendant.

¶ 38    In *Jackson*, this court found defense counsel's conduct satisfied the prejudice prong of *Strickland* where counsel elicited testimony showing the defendant reached into a bag allegedly containing narcotics, retrieved an object, and handed it to another person. *Jackson*, 318 Ill. App. 3d at 327-28. This court relied on the fact that the constructive possession charge could not have been established without this testimony, noting that, without the cross-examination by defense counsel, this element of the State's case would not have been established. *Id.* at 328.

¶ 39    In *Bailey*, defense counsel elicited the only testimony that linked the defendant to an unknown man on the corner yelling "rocks" indicating that there were drugs for sale. *Bailey*, 374 Ill. App. 3d at 614-15. Without this testimony, the police only had evidence that the defendant took money from people and gave them something in return but not that it was an exchange for drugs. *Id.* The court noted that "[t]he testimony was a key piece of evidence. It connected the defendant to the man on the corner yelling, 'rocks.' It also explained why no money was found in

defendant's pockets, and the only money found on the defendant was $63 between two layers of socks." *Id.* at 615.

¶ 40    In *Orta*, defense counsel brought out on cross examination the fact that controlled funds from a previous buy were found in the defendant's home. The trial court in a bench trial considered that fact as strong evidence that the defendant was in the business of selling drugs. *Orta*, 361 Ill. App. 3d at 350.

¶ 41    This case is different because all elements of the crime of selling heroin were established by the State without relying on any of the information brought out by defense counsel. While the question on cross-examination about the phone number was not helpful to the defense, it was simply not harmful enough to be prejudicial under *Strickland*. There is simply no "reasonable probability" that without this question, the result of the trial would have been different. *Evans*, 209 Ill. 2d at 220.

¶ 42    As noted above, we must consider defense counsel's performance as a whole and not merely focus upon isolated incidents of conduct. *Redmon*, 2022 IL App (3d) 190167, ¶ 19. Defense counsel brought out to the jury the problems with the State's case, in terms of the delay in the arrest, the lack of physical evidence, and questions about the identifications. In the process, counsel also asked at least one question that was harmful to the defense and helpful to the State. But none of the testimony that defense counsel elicited, whether viewed in isolation or cumulatively, was so damaging to the defense that it created "a reasonable probability that, absent counsel's alleged error, the trial's outcome would have been different." *People v. Evans*, 209 Ill. 2d at 220.

¶ 43                                    IV. CONCLUSION

¶ 44    Because Mr. Smith failed to show his trial counsel was ineffective, we affirm.

¶ 45    Affirmed.

¶ 46    JUSTICE ODEN JOHNSON, dissenting:

¶ 47    I must dissent because I am amply persuaded by defendant's ineffective assistance claim.

¶ 48    As we can all agree, to prevail on a claim of ineffective assistance, a defendant must show (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced defendant such that he was deprived of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Defendant must show that "counsel's errors were so egregious, and his performance so deficient, that he did not function [as] the counsel guaranteed by the sixth amendment." *People v. Garmon*, 394 Ill. App. 3d 977, 991 (2009) (citing *People v. Johnson*, 218 Ill. 2d 125, 143-44 (2005). In addition, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

¶ 49    In the controlled buy at issue, there was: (1) no photographic or video recording of the transaction; (2) no arrest on the scene; (3) no recovery of the recorded money; (4) no admissions by defendant; (5) no fingerprint recovered on the narcotic package to connect it to defendant; and (6) no specific written description of defendant in a contemporaneous police report.[1] Despite the ubiquity of cell phones and the surveillance of the transaction by a separate officer, there was not a single photo of the offense. There was no recovery of the recorded funds, although the funds had been recorded for that purpose. There was no submission of the packaged narcotics for fingerprints. Last but not least, the arrest occurred months later.

---

[1] The police reports are not in the record before us, although they were produced by the State in discovery and discussed in testimony.

¶ 50    Against this dim backdrop, defense counsel elicited vivid and damning testimony on cross—damning of his own client, that is.

¶ 51    First, defense counsel elicited testimony from the undercover officer asserting that the phone number that the officer dialed to set up the controlled buy was, in fact, defendant's number.  This testimony was elicited over the State's objection. Not content with a simple assertion, counsel elicited even more testimony that the officer had viewed documents establishing that the phone was registered specifically to defendant.[2]

¶ 52    The majority misses the point where it suggests that this evidence was not key to convicting defendant since two officers observed the sale. *Supra* ¶ 37. This remark assumes the police were credible—which is a pivotal assumption, given that their credibility was practically the only issue at trial.  Once the majority assumed that the officers' testimony established, as truth, a sale by defendant, the natural progression was to find that the testimony about the phone number merely demonstrated that defendant *also* arranged the sale.  *Supra* ¶ 37. The majority, thereby, missed the significance of the testimony about the phone number, which was that it served, primarily, to bolster the police testimony about the underlying sale.

¶ 53    It bolstered the police testimony by showing that there were documents, viewed by the police, that proved the number belonged to defendant. This point would have been established beyond questioning for the jury—when it was clearly beyond questioning for defense counsel who did not ask a single follow up question.  The very fact that this point was brought out by the defense established its bipartisan veracity for the jury.

---

[2] The undercover officer testified that "[w]e do our—what we initially get from a target, we do a workup on that individual including phone numbers, addresses and so forth." According to the officer, this target workup established defendant's phone number.

¶ 54    Where a defense counsel elicits damning and otherwise inadmissible evidence through cross-examination, which was not offered by the State, which has no legitimate tactical purpose for the defense, and which is admitted over the State's objection, this court has not hesitated to find both prongs of *Strickland* satisfied. *People v. Bailey*, 374 Ill. App. 3d 608, 614 (2007); *People v. Orta*, 361 Ill. App. 3d 342, 347 (2005) ("The evidence prejudiced the defense with no legitimate tactical purpose."); *id.* at 350 (the court reversed and remanded for a new trial due to "[d]efense counsel's repeated and misguided efforts to elicit damaging testimony not introduced by the State"); *People v. Jackson*, 318 Ill. App. 3d 321, 328 (2000) (when defense counsel upsets the adversarial balance between defense and prosecution, the trial fails to serve as an adversarial testing ground).

¶ 55    The subject of counsel's very next question was whether the undercover officer was aware that defendant was on electronic monitoring. Defense counsel explained that electronic monitoring was "where they wear a bracelet." The State objected; the proceedings stopped; the jury was excused as a sidebar was held; and the jury was brought back—all of this capturing and focusing the jury's attention on the question which was repeated a second time: "whether or not you knew, at the time you were investigating, whether or not he was on electronic monitoring or GPS?" Although the officer did not know that defendant was on electronic monitoring at the time of the offense, the nature of defense counsel's question strongly implied that defendant was, in fact, wearing an ankle bracelet, thereby, establishing that defendant had coexisting issues with the law.

¶ 56    When asked in the presentence report "why he decided to commit this offense," defendant replied: "I didn't decide to commit this offense. It wasn't me because I was on G.P.S. house arrest." Similarly, counsel asserted in his opening statement that "the evidence will show that

Mr. Smith was not there." If it was counsel's intent to introduce the monitoring as proof of total exoneration, it was mind-boggling incompetence to bring out the damaging fact of electronic monitoring without the desired exculpatory information—namely, that the police could track defendant's whereabouts, pinpoint where he was, and definitively establish whether he was, or was not, at the sale location.

¶ 57    Last but not least, counsel repeatedly asked the surveillance officer about why he had not memorialized the details of defendant's physical appearance and clothing, and so the officer explained that he knew defendant from prior contacts. The officer stated: "I remember just putting in there [his report] that I remember who the subject was."

¶ 58    The fact that the phone registration, electronic monitoring, and the police report were established by the defense bolsters the officers' credibility in the eyes of a questioning jury, which this certainly was. Left out of the majority opinion were the four questions to the judge, sent out by the jury on at least two separate occasions,[3] asking: (1) "Why was he not arrested that day?"; (2) "Why did [you] record the money if you don't arrest immediately?"; (3) "What does typical suspect profile workup[4] before an undercover operation look like?"; and (4) "Does solely an eyewitness identification meet the burden of proof for beyond a reasonable doubt, assuming the jury finds the witness or witnesses credible and believable?" The court told them to continue deliberating. These notes show that the jury was struggling with the issue of the

_____

[3] Neither the original jury notes nor a photocopy of them appear in the record before us. However, we know from the trial transcript that the notes were sent on at least two different occasions by the jury. First, the judge read three questions aloud to the attorneys, without indicating when each had been received. When the judge then stated he would read the notes "verbatim," he did not indicate that the questions were preceded by "first," "second," or "third" or numbers. After having read the first three question sent out, the judge stated: "So now, the jury has another question." The transcript, thus, indicates that there were at least two batches of questions, if not more.
[4] The undercover officer had testified that this "workup" was the source for defendant's phone number.

officers' credibility; the jurors could not phantom why the officers had not arrested defendant sooner, and why they let recorded funds just disappear. They needed to know whether the officers' identification was sufficient. In particular, the jurors were focusing on the damning information brought out by defense counsel: namely, the phone number on the target "workup."

¶ 59    The State exploited the phone number information in its own closing and again in its rebuttal closing. The State's first line in closing argument was: "Physical evidence doesn't lie." In the next two lines, the State argued that Investigator Brown was "part of an operation to make an undercover purchase from this defendant, Darryl Smith. She made a phone call to a number and during that phone call, she asked *him*." (Emphasis added.) Just in case the jury missed that connection the first time around, the State repeated it in in its rebuttal closing. In rebuttal, the State argued that Investigator Brown "called the number, asked for heroin, showed up at an address provided by the defendant, *who was on the other end of that line*." (Emphasis added.)

¶ 60    In the defense closing, counsel argued that the police could have "produced a much better set of facts or proof" if they had inquired about electronic monitoring. However, counsel argued, it was a "point of inquiry" they missed. This argument served to further turn a possibly exculpatory point into an inculpatory one, by suggesting that more proof was there for the asking if the police had only looked.

¶ 61    During sentencing, while seeking a lenient sentence, counsel argued to the trial judge: "if you recall, and maybe you don't, this particular incident was perpetrated and conspired in by the Sheriff's Department because at the time that this occurred, the defendant was in custody of the Sheriff on home monitor." Although counsel alluded to this evidence again and again to the jury, thereby prejudicing defendant's case with a reminder of defendant's other bad acts,

counsel never delivered on the indicated defense, namely, that defendant was being monitored by the police at the time so it could not have been him.

¶ 62    The majority notes that "many" of defendant's prior convictions were for narcotics. *Supra* ¶ 14. In his presentence report, only one drug conviction is marked as heroin, and that is this current conviction. Of his four prior drug convictions, only one of the four indicates the drug and that was for marijuana possession. Another one is marked as a schedule I or II narcotic. It was only this year that the United States DEA announced its intent to remove marijuana from its then-current classification as a Schedule I narcotic. See https://apnews.com/article /marijuana-biden-dea-criminal-justice-pot-f833a8dae6ceb31a8658a5d65832a3b8. In his PSI, defendant admitted that, prior to his incarceration, he was using marijuana every day, but had since completed a drug treatment program.

¶ 63    In sum, I find counsel's errors so egregious as to have deprived defendant of a fair trial. "For defense counsel to elicit testimony which proves a critical element of the State's case where the State has not done so upsets the balance between defense and prosecution so that defendant's trial is rendered unfair." *Jackson*, 318 Ill. App. 3d at 328. I also find there exists a reasonable probability that, but for counsel's unquestionably damning errors, the result would have been different. There was no evidence at trial to corroborate the officers' statements that it was defendant who had sold them drugs or even that a drug sale had occurred: that is, other than the fungible and unfingerprinted narcotics. Specifically, the money had gone MIA,[5] there was not a single photo, and the police waited months to arrest defendant, even though they claimed to have known who the perpetrator was all along. Consequently, I dissent.

---

[5] Ironically, the only trial exhibit in the appellate record is an illegible photocopy of the "recorded" money. Accompanying the photocopy is a "Pre-Recoded Money List," which gives, instead of a list of serial numbers, just a note saying, "see attached." The "List" thereby refers the reader to the photocopy--on which the vast majority of serial numbers are completely illegible.