**Barbara L. OUBER, Petitioner,**

v.

**Barbara GUARINO, Respondent.**

**CIV. A. No. 99–11021–RCL.**

United States District Court,
D. Massachusetts.

Aug. 29, 2001.

---

John Andrews, Robert M. Strasnick, John M. Updegraph, Andrews & Koufman, LLC, Salem, MA, for Petitioner.

Catherine E. Sullivan, Assistant Attorney General, Criminal Bureau, Boston, MA, for Respondent.

## MEMORANDUM AND ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

LINDSAY, District Judge.

### I. Introduction and Procedural History

Before me is a petition of Barbara L. Ouber (the "petitioner") for the issuance of

a writ of habeas corpus. The petitioner was convicted of trafficking in cocaine in February, 1997, following a jury trial in the Barnstable (Massachusetts) Superior Court. After the conviction, the trial judge sentenced the petitioner to a term of five to seven years in a Massachusetts state prison. The trial, which resulted in the conviction, was the third in which the petitioner was charged with the same offense. The two previous trials, in each of which the petitioner testified, ended in mistrials.[1] That the petitioner did not testify in the third trial, as she had in the two previous trials, is one of the circumstances from which the present petition derives.

Following her conviction, the petitioner filed an appeal with the Massachusetts Appeals Court (the "Appeals Court") and a motion for a new trial in the trial court. In each she claimed ineffective assistance of counsel. The trial judge denied the petitioner's motion for a new trial. Thereafter, the Appeals Court affirmed both the conviction of the petitioner and the order of the trial judge denying the petitioner's motion for a new trial. *See Commonwealth v. Ouber*, 46 Mass.App.Ct. 1112, 707 N.E.2d 408, 1999 WL 130759 (1999). The petitioner sought unsuccessfully to have the matters reconsidered by the Appeals Court. The petition for reconsideration was denied on March 2, 1999. The petitioner then filed an application for leave to obtain further appellate review with the Supreme Judicial Court, the state court of last resort in Massachusetts. That application was denied on March 26, 1999.

The petitioner then sought relief in this court by way of the present petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). She claims here that her petition for habeas corpus relief is necessitated by the failure of the Massachusetts courts "to overturn [her] conviction ... despite the fact that she was deprived of [c]onstitutionally effective assistance of counsel as guaranteed by the Sixth Amendment to the Constitution." Memorandum in Support of Petition for Habeas Corpus ("Petitioner's Memorandum") at 1. The specific constitutional claim before me—as it was before the Appeals Court—is that the performance of the petitioner's attorney at trial ("Trial Counsel") was prejudicially deficient, in that Trial Counsel made four promises to the jury that he would call the petitioner as a witness at trial, but failed to keep those promises. *See id.* at 8.

## II. The Trial and Peri–Trial Events

The trial of the petitioner took place over two days. The events relevant to the present petition occurring at, and surrounding, the trial are summarized as follows.

### A. Opening Statements

On the first day of the trial, an assistant district attorney for the Cape Cod and Islands District, representing the Commonwealth of Massachusetts (the "Prosecutor"), and Trial Counsel for the petitioner gave opening statements along the following lines.

The Prosecutor told the jury that the Commonwealth expected to prove through the testimony of its primary witness, an undercover police officer named Todd Shea ("Shea"), that the petitioner sold fifty-six grams of cocaine to Shea for $2,000 on March 8, 1992. *See* Trial Transcript ("Tr.") at 44–46. The transaction in question, the Prosecutor said, took place inside

---

1. Events occurring in the first two trials are discussed, as appropriate, in Part III of this memorandum.

the petitioner's automobile in a parking lot at a Hyannis, Massachusetts bar called Bud's Country Lounge and came about as a result of a three-month undercover investigation into a Cape Cod cocaine ring. *See id.* The investigation had ultimately come to focus on one Nicholas Tsoleridis, brother of the petitioner, and on the petitioner herself, both of whom resided at 9 Beth Lane in Hyannis.[2] *See id.* at 47. The Prosecutor stated:

> The ultimate issue for you to decide in this case will be on March the 8th, 1992, did this Defendant meet an undercover officer in a parking lot, knowingly and intentionally give him cocaine in this case. . . . What I expect the issue to be was did she knowingly and intentionally distribute that or give that to the officer. And that's where its going to be very important in this case that you listen to the words of Todd Shea as he describes that transaction, and he describes Barbara Ouber's words and actions in that car.

*Id.* at 48–49. The Prosecutor further said that Shea would testify that the petitioner handed him two partially-sealed envelopes of cocaine and that:

> [Shea] opened those envelopes up, pulled the substance out . . . [a]sks her, [i]s this of the same quality that I had boughten [sic] from Nick Tsoleridis in the past? She indicates, [y]es, it is. And the weight is all there. And those words are going to be very important when you determine her knowledge and intent in this case.

*Id.* at 49.

In his opening, Trial Counsel described the case as a credibility contest between the petitioner and Shea concerning what happened between the two on March 8, 1992. *See id.* at 60–61.

The cocaine at issue at the trial was contained in two envelopes. *See id.* at 58. The envelopes, Trial Counsel said, were sealed and were such that one could not see through them. *See id.* at 58–59. Trial Counsel told the jury that the petitioner had been directed by her domineering brother, Tsoleridis, to take the envelopes to Bud's Country Lounge and deliver them to a man there (who turned out to be Shea) and to collect money the man owed Tsoleridis. *See id.* at 56, 58–59. Trial Counsel said that the jury would hear that Tsoleridis told the petitioner that the envelopes contained drill bits, and that the petitioner accepted that explanation without question and without herself inspecting the envelopes. *See id.* at 59. The petitioner's defense, as explained by Trial Counsel, was the "mailman defense;" that is, the petitioner unknowingly delivered the cocaine to Shea in sealed envelopes in the way that a letter carrier delivers mail in sealed envelopes, without knowing the contents of the envelopes. *See id.* at 58.

Trial Counsel told the jury, on four separate occasions, that Ouber herself would testify about how she came to deliver the cocaine, about her lack of knowledge that the envelopes contained cocaine and about the absence of any intent on her part to traffic in cocaine, as charged in the indictments. On the first occasion, he said:

> [Y]ou'll hear from the evidence from her and from another witness— [that there] were two sealed white envelopes.
>
> .     .     .     .     .
>
> You'll hear what she was told [by her brother]; that this man owes me money; that there is some drill bits in the envel-

---

**2.** Tsoleridis was also indicted, but apparently fled to Greece before the petitioner's first trial. *See id.* at 154–55; Respondent's Memo- randum in Opposition to Petition for a Writ of Habeas Corpus ("Respondent's Opposition Memorandum") at 3 n. 2.

opes. He's to take them. And you'll hear what he told the officer, Todd Shea. He said, The cocaine will be in white envelopes. *Id.* at 58–59.

Trial Counsel told the jury of the petitioner's expected testimony a second time during the course of pointing out the petitioner's domination by her brother and her ignorance of what the envelopes contained. Trial Counsel said: "Obviously if [the envelopes] were unsealed, a person could peek in and—and not that Barbara Ouber did. She will tell you she did what her brother asked her to do unquestionably and trusted, and she was told to collect the money he owed her, and she did." *Id.* at 59.

In a third promise of the petitioner's testimony, Trial Counsel said: "This case is going to come down to what happened in that car and what your findings are as you listen to the credibility and the testimony of Todd Shea versus what you [sic] findings are as you listen to the testimony of Barbara Ouber." *Id.* at 59–60.

At the end of his opening, Trial Counsel promised the testimony of the petitioner a fourth time. He told the jurors that they would hear a difference of "opinion" as to what happened between the petitioner and Shea in the car on March 8, 1992 and as to what conversation the two had at that time. Trial Counsel stated: "[Y]ou're going to have to decide the truth and veracity of those two witness; and that will be your ultimate decision in this case." *Id.* at 61.

The petitioner was not called as a witness. Trial Counsel rested before lunch the day following his opening. *See id.* at 258, 260–261.

### B. *The Commonwealth's Case*

The Commonwealth's evidence consisted of the testimony of three law enforcement officers. Its primary witness was Shea, a special agent of the Drug Enforcement Administration, who worked as an undercover police officer with the Cape Cod Drug Task Force during the time in question. *See id.* at 61. His testimony, in summary, was as follows.

In the winter of 1992, Shea was part of a drug investigation that targeted Tsoleridis and the petitioner. *See id.* at 63–64. On January 25, 1992, Shea and a confidential informant (the "CI") went to the home Tsoleridis and the petitioner shared at 9 Beth Lane in Hyannis, to consummate, with Tsoleridis, the purchase of one ounce of cocaine that Shea had previously negotiated with Tsoleridis. *Id.* at 64.

When Shea entered the house, he observed Tsoleridis coming down a stairway and Ouber standing at the bottom of the stairway. *See id.* at 66. Shea told Tsoleridis that he wanted to inspect the package before making payment. *See id.* at 67. At that point, the petitioner was three to four feet away from Shea, looking in his direction. *See id.* Tsoleridis then left the house saying that he did not want to complete the transaction on his property. *See id.* at 68. Tsoleridis, Shea, and the CI drove to a nearby location in Shea's vehicle. *See id.* at 68–69. At that location, Tsoleridis took a clear, plastic package from his jacket pocket and gave it to Shea, and Shea, after inspecting the package, gave Tsoleridis $1,100 from funds supplied by the government. *See id.* Tsoleridis told Shea that Tsoleridis had a source that could provide kilogram quantities of cocaine, and that Tsoleridis could supply Shea with four ounces of cocaine at a future date. *See id.* at 70. Shea then drove Tsoleridis back to 9 Beth Lane and events concluded with Tsoleridis's giving Shea his cellular telephone number. *See id.* The package Tsoleridis gave to Shea

on January 25, 1992 was analyzed and determined to be cocaine. *See id.* at 69.

On February 19, 1992, Shea and Tsoleridis met at a K–Mart parking lot on Route 132 in Hyannis. *See id.* at 71. Tsoleridis handed Shea four ounces of cocaine in exchange for $4,000. The cocaine was packaged in clear, plastic Ziploc bags placed inside a red sock. *See id.* at 72.

A similar transaction occurred on March 13, 1992 at the same K–Mart parking lot. This time Shea purchased ten ounces of cocaine from Tsoleridis in exchange for $10,000. The cocaine was packaged in clear, plastic Ziploc bags inside a brown paper bag. *See id.* at 73.

At some time in the afternoon on March 8, 1992, Shea received a call on his pager from Tsoleridis's cellular telephone. *See id.* at 79–80. Shea returned the call at approximately 4:40 p.m. *See id.* at 80. Tsoleridis told Shea that he could sell him ten ounces of cocaine. *See id.* at 81. Claiming to be in Boston awaiting a flight to Montreal, Tsoleridis said that Shea would have to purchase the cocaine in Boston.[3] *See id.* Shea told Tsoleridis that he could not go to Boston. Tsoleridis then offered to sell Shea two ounces of cocaine for $2,000 to hold him over until Tsoleridis returned from Montreal. *See id.* Tsoleridis said that he could make arrangements with his sister, the petitioner, to meet Shea with the cocaine. *See id.* In a later telephone conversation, Tsoleridis instructed Shea to meet the petitioner at approximately 6:00 p.m. in the parking lot of Bud's Country Lounge on Bearse's Way in Hyannis. *See id.* at 82, 84.

Shortly before 6:00 p.m., Shea arrived in a pickup truck and parked it along the rear side of Bud's Country Lounge. *See id.* at 84. The parking lot was nearly empty that evening. *See id.* The petitioner arrived alone in a Toyota Camry shortly after 6:00 p.m. *See id.* at 84–85. She parked next to Shea's truck and he got into her vehicle and sat in the passenger seat. *See id.* at 85. Shea asked the petitioner if she were Tsoleridis's sister, to which the petitioner responded: "Yes, my name is Barbara." *Id.* at 85. The petitioner then handed Shea two partially-sealed white envelopes, each containing a clear, plastic Ziploc bag of a white substance. *See id.* As Shea opened the envelopes and looked at their contents,[4] he asked the petitioner "if this was the stuff" that he had gotten in the past from her brother and "if the weight was all there." *Id.* at 85, 87. Ouber responded: "Yes, it's the same. The weight's all there. It's the same stuff my brother was giving you." *Id.*

After inspecting the contents of the envelope, Shea handed the petitioner $2,000 in cash. *See id.* at 87. The petitioner took the money, started to count it, and then dropped it on the floor of the car. *See id.* at 88. Shea then left the petitioner's car and drove to a prearranged location where he met members of his surveillance team and delivered the envelopes and their contents. *See id.*

Robert J. Melia, a Massachusetts State Police sergeant assigned to the Cape Cod Drug Task Force, testified that laboratory

---

**3.** The evidence showed that Tsoleridis actually was at home in Hyannis, but was preparing to drive to Montreal via Boston. *See id.* at 110, 227, 231.

**4.** Shea testified that he broke the partially-sealed envelopes, took out the clear, plastic Ziploc bags, and held them up "to get some light" in order to view the substance before transferring the money to the petitioner. *See id.* at 86, 90, 93. He also felt the contents of both bags. *See id.* Shea testified that he did all this in front of the petitioner, but he could not recall whether she was looking in his direction at the time. *See id.* at 87.

analysis revealed that the substance in the envelopes Shea received from the petitioner was sixty-two percent pure cocaine and weighed 56.07 grams. *See id.* at 142.

Melia, who was part of the surveillance team on March 8, 1992 testified that he observed Shea enter the parking lot in his truck at 5:52 p.m. *See id.* at 137. He said he saw the petitioner enter the parking lot at 6:04 p.m. *See id.* at 138. He testified that he saw Shea enter the petitioner's vehicle as soon as the petitioner drove into the parking lot and leave the vehicle two minutes later to return to his truck and depart the area. *See id.* Thereafter, according to Melia, the petitioner started to leave the parking lot, stopped and remained stationary for two minutes, and then left. *See id.* at 138–39.

Melia neither heard nor saw what transpired between the petitioner and Shea during the two minutes Shea was in the petitioner's vehicle. *See id.* at 146. The transaction in the vehicle was not electronically recorded. *See id.* No other witness testified for the Commonwealth regarding the events that occurred inside the petitioner's vehicle on March 8, 1992.[5]

### C. The Petitioner's Case

As noted earlier, the petitioner did not testify at this third trial. Instead, Trial Counsel presented the testimony of twenty-six other witnesses. Twenty-four of these witness were character witnesses, and among them were several priests, a bishop,[6] and friends and acquaintances of the petitioner, who testified to the petitioner's reputation in the community for such traits as honor, honesty and truthfulness.

*See e.g., id.* at 154, 172–73, 176, 185, 187–88, 200–01, 209–11, 217, 219, 221. One witness, for example, testified that the petitioner was the only "truth person [sic] and trustful" person she had met in her life. *Id.* at 173. Another testified that: "[S]he's [an] honest person. She always tell[s] the truth, never lie[s.]" *Id.* at 176. Still another said: "I never met such [an] honest and open woman like Barbara." *Id.* at 219. Several witnesses described the petitioner as a devoted mother, a pious churchgoer, and as hard-working and generous. *See e.g., id.* at 157–58, 204, 209, 213, 217, 223–24.

In addition, some witnesses described the relationship between the petitioner and Tsoleridis. They testified that the petitioner acted more like a mother to Tsoleridis than a sister, but that he was "very demanding," "barked orders" at her and gave her "a hard time." *Id.* at 169–70, 174, 226. A few witness also spoke of the petitioner's care of her son who has a developmental disability. *See e.g., id.* at 157–58, 202–03, 211–12, 213, 217, 223–24.

The twenty-fifth witness was Patricia Gisleson ("Gisleson"), a friend of the petitioner.[7] Gisleson testified about the events of March 8. Her testimony is summarized as follows.

Gisleson arrived at the 9 Beth Lane at approximately 5:00 p.m. on March 8, 1992 to babysit the petitioner's son. *See id.* at 227. The petitioner and Tsoleridis were in the kitchen, and she could hear them yelling at each other. *See id.* at 229. Gisleson testified that Tsoleridis "wanted [Ouber] to collect some money that this guy

---

**5.** A third witness for the Commonwealth, Michael J. Barry, a Massachusetts State Police sergeant, testified as to the chain of custody of the substance Shea received from the petitioner. Tr. at 130–143.

**6.** The bishop was the presiding prelate for the New England diocese of the Eastern Orthodox Church. *See id.* at 222.

**7.** The twenty-sixth and final witness testified primarily about the relationship between the petitioner and Tsoleridis. *See id.* at 253–56.

owed him," and that the petitioner was yelling: "Collect your own debts. I don't want to do it. I have to go to church. I'm late already." *Id.* As Gisleson entered the kitchen, she saw Tsoleridis strike Ouber. *See id.* Gisleson then grabbed Tsoleridis's fist to prevent him from hitting the petitioner a second time. The petitioner, according to Gisleson, acquiesced to Tsoleridis's demand after Tsoleridis threatened to kill the petitioner. *See id.* at 230. Gisleson pointed out that Tsoleridis had a history of physically abusing the petitioner. *See id.*

Gisleson said that she heard Tsoleridis tell the petitioner that he wanted her to deliver drill bits and collect a $2,000 debt owed to him. *See id.* at 229. According to Gisleson, Tsoleridis told the petitioner that he had put the drill bits on the seat of the petitioner's car. *See id.* at 234.

Gisleson went outside to move her car, which was blocking the petitioner's car parked inside the garage. Gisleson also moved the petitioner's car out of the garage. *See id.* at 230–31. While inside the petitioner's car, Gisleson said, she saw two white sealed envelopes on the passenger seat. *See id.* at 230–31, 233.

The petitioner left the house in her car and returned within ten minutes, crying and shaken. *See id.* at 231–32. The petitioner told Gisleson that the man she was supposed to meet had "tried to get her to go into his car" and that "[s]he was frightened to death." *Id.* at 232. Gisleson testified that the petitioner told her that she "tried to take off," but the man grabbed the envelopes on the passenger seat, entered and sat down in the petitioner's car, and threw money at the petitioner as she tried to drive away. *See id.* at 241, 251–52. The petitioner told Gisleson that she never touched the envelopes. *See id.* at 252. When the petitioner returned home,

she put the money in her brother's room. *See id.* at 241.

## D. *The Decision Concerning the Petitioner's Testimony*

In an affidavit submitted with the present petition, the petitioner says that she was "eager" to testify at the third trial and "was shocked" when Trial Counsel advised her not to testify. Affidavit of Barbara Ouber ("Petitioner's Aff.") at ¶¶ 6–7. In his affidavit, submitted with the present petition, Trial Counsel acknowledged that he planned, at the time of his opening, to call the petitioner as a witness. *See* Affidavit of Trial Counsel ("Trial Counsel's Aff.") at ¶ 9. Trial Counsel recognized the petitioner's "strong desire" to testify in this third trial, as she had done in the previous two trials. *Id.*

At the end of the first day of the trial, however, Trial Counsel had a discussion at the courthouse with the petitioner's priest, the bishop, other priests and certain of petitioner's friends about the relative "merits and perils" of the petitioner's testifying. *See id.* at ¶¶ 9–10. Trial Counsel believed that the petitioner should not testify. *See id.* at ¶ 10.

That evening, at a meeting at the petitioner's home at 9 Beth Lane, with Trial Counsel in attendance and participating, the bishop and priests from the petitioner's church urged the petitioner not to testify. *See* Petitioner's Aff. at ¶ 8. They told the petitioner that "[Trial Counsel] said that it was best to follow his advice not to testify." *Id.*

On the morning of the second day of trial, the petitioner's priest drove her to the courthouse and again "implored [her] to do as [Trial Counsel] said and not to testify." *Id.* at ¶ 9. During the trial that day, the petitioner said, she "felt compelled" and "pressured" not to testify "because [her] attorney was so adamant and

because [her] closest advisors from the church told [her] that [Trial Counsel] did not want [her] to testify." *See id.* at ¶ 10.

Prior to the testimony of the final defense witness, Trial Counsel told the petitioner that she "should waive [her] right to testify," telling her that if she did testify, the Commonwealth would be able to "introduce" previously suppressed evidence (drugs and related items) seized in a March 13, 1992 search of petitioner's bedroom at 9 Beth Lane. *Id.* at ¶ 11.

Trial Counsel did not advise the petitioner of the possible negative impact on the jury of her failure to testify in light of his opening statement. *See id.* at ¶ 12; Trial Counsel's Aff. at ¶ 11. He also did not advise the petitioner that her decision not to testify "might diminish the impact of testimony of the witnesses who testified" to her reputation for truth, honesty, piety, and the like. *Id.*

Before the beginning of proceedings in court on the second day of trial, Trial Counsel met privately with the petitioner with the court reporter present. The court reporter recorded the conversation between the petitioner and Trial Counsel as follows.

Q: [by Trial Counsel]: For the record, we are Barbara Ouber and [Trial Counsel], her attorney; and we are in a little conference room. It's approximately 11′ o'clock. All the defense witnesses have testified except for Barbara. We're here basically to decide whether or not she's going to testify. Okay, there's one other witness that we're going to call, but this is to see if Barbara will testify. Now, Barbara, you know what testifying is all about. This case has been tried twice. You testified the first two times; and you know that if you testify, they can bring in all the evidence that was seized in your house as a result of the search warrant, right?

A: [by Ouber]: Yes.

Q: And we have talked about this before. And am I correct that you decided not to testify today?

A: Yes.

Q: We're going to try it this way because the first two times didn't work?

A: Yes.

Q: You know that you can't be made to testify?

A: Yes.

Q: And that his Honor[,] if you don't testify[,] will instruct the jury that they can draw no inferences from your not testifying?

A: Yes.

Q: Okay. So, we're not testifying then?

A: Yes.

Tr. at 253–254.

After his meeting with the petitioner, Trial Counsel called his final witness and then rested.

E. *Closing Arguments*

In his closing, Trial Counsel first referred to his opening statement and apparently to his promise to present the petitioner as a witness. He said:

[I]t's not the facts that the lawyers represent. I guess the most glaring example is my opening statement. I told you we'd present more of a case and there would be more of a case. It's only the facts in evidence that you heard from the stand, and it's not even the questions the lawyers ask unless the witness adopted the question and said, Yes, I agree with you.

*Id.* at 264. Trial Counsel then discussed the events of March 8, stressing that the crux of the case was what transpired in the car between Shea and the petitioner. He said that "the issue is [the petitioner's] knowledge and intent," *id.* at 265. He

challenged Shea's recital of the conversation he had with the petitioner:

> Does he tell you—the conversation he tells you something about he asked her if this was the same stuff, and she said the weight is there, the quality is there. I suggest to you that those were not the words that he used. He may have said that. Is the weight there and the quality there. Who knows[?]

*Id.* at 272.

In the end, Trial Counsel again invited the jury to "go back to the testimony and credibility of Todd Shea." *Id.* at 275. He concluded:

> [T]he Defendant doesn't have to put on a defense. The Defendant doesn't have to testify. His Honor will tell you that. This case is not about Barbara Ouber proving that she is innocent to you. Because that would be impossible. The question is only has the Commonwealth proved to you beyond a reasonable doubt that she's guilty. I suggest to you strongly that if you examine the evidence, you will not be able to reach that conclusion.

*Id.* at 276–77.

The Prosecutor, in his closing, recalled the events of March 8 as testified to by Shea. He stressed that the case rested on the believability of Shea's testimony "about what happened in that car." *Id.* at 286. He invited the jury to examine the testimony of Shea versus the "tailored" testimony of Gisleson. *Id.* at 288. He said that the case ultimately "comes down to the issue of credibility. The credibility of Todd Shea ultimately." *Id.* at 280. He argued:

> Now, why should you believe the testimony of Todd Shea? He tells you what occurred in that car on that particular day.

> \* \* \* \* \* \*

> [S]imply because what he tells you on the witness stand happens to fly in the face of a large group of people who are willing to come in and testify that Barbara Ouber's a nice person, she's a good mother, things of that nature, that does not mean for one minute that what happened in that car on March the 8th didn't happen exactly as Todd Shea tells you it happened. None of those people were present in the car on March the 8th, 1992. Shea and Barbara Ouber were present in that car, and they were alone.

*Id.*

## F. *The Trial Judge's Charge to the Jury*

The trial judge instructed the jury that the burden was on the Commonwealth to prove beyond a reasonable doubt that the defendant was guilty of the offense of trafficking in cocaine. He said:

> And keep in mind that the burden throughout the entire trial is on the Commonwealth to prove each and every element of the offense charged; and the burden is never on the defendant to prove anything to you.

*Id.* at 296.

Later in his charge the judge said:

> The burden of proof never shifts. The defendant is not required to call any witnesses or produce any evidence since she is presumed to be innocent of this particular offense.

*Id.* at 307.

In a still later portion of the charge, he elaborated on the Commonwealth's burden:

> Now, the burden is on the Commonwealth to prove the defendant guilty of trafficking in cocaine. In order to do that, they must prove to you five elements. I'll explain very briefly what

those elements are, and then I will go into more detail with better definitions of what those elements are.

The first thing is that the defendant, Barbara Ouber, possessed a certain substance. That's a general term, possessed a certain substance. Second, that the substance was a controlled substance; namely, cocaine. Third, that the defendant possessed that controlled substance knowingly or intentionally; and fourth, that the defendant had the specific intent to distribute the controlled substance; and fifth, that the amount of cocaine was 28 grams or more.

*Id.* at 311.

The court also gave the customary instruction to the jury concerning the right of the defendant to decline to testify. He said:

You have noticed that the defendant did not testify. She has a constitutional right not to testify. She can stand up and say to the Commonwealth, Go ahead. Prove your case. And that's the burden. And it's up to the Commonwealth to prove the case.

You can't comment on the fact that she did not testify. It's her constitutional right. You can't comment on it when you're deliberating the issues of this case. Because she does, in fact, have that right that we all have not to testify.

*Id.* at 307–8.

### III. Analysis

**A. Standard of Review Under the Antiterrorism and Effective Death Penalty Act**

The petition in this case is governed by the amendment to 28 U.S.C. § 2254 wrought by the enactment in 1996 of the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Pub.L. No. 104–132, 110 Stat. 1214. AEDPA fundamentally changed the standard of habeas review that a federal court must apply when it examines, on a petition for habeas corpus relief, a state court's adjudication of a criminal defendant's claims of constitutional error. "Prior to AEDPA's passage, a federal court's exercise of habeas corpus jurisdiction did not require that it pay any specific heed to the underlying state court decision." *O'Brien v. Dubois,* 145 F.3d 16, 20 (1st Cir.1998). That is to say, under the pre-AEDPA standard of review the federal habeas court was not required to defer to the state court's resolution of a question of constitutional law. With the AEDPA amendments, the habeas corpus statute now provides, in pertinent part, that:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1).

Under the AEDPA amendments to § 2254, then, the focus of the federal habeas court specifically must be upon the state court's decision—that is, whether that decision was contrary to or an unreasonable application of relevant Supreme Court precedent. *See Mountjoy v. Warden New Hampshire State Prison,* 245 F.3d 31, 35 (1st Cir.2001); *O'Brien,* 145 F.3d at 20.

The Supreme Court recently provided critical guidance with respect to the meaning of the "contrary to" and "unreasonable application" clauses used in AEDPA. *Williams v. Taylor,* 529 U.S. 362, 402–13,

120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). In *Williams*, a habeas case in which petitioner made a claim of ineffective assistance of counsel, the Court explained that the phrases "contrary to" and "unreasonable application of" have independent meaning and define two categories in which a state prisoner may obtain relief in a federal court with respect to a claim finally adjudicated on the merits in a state court. *See id.* at 404, 120 S.Ct. 1495.

As to the meaning of the "contrary to" clause the court said that "the state court's decision must be substantially different from the relevant precedent of this Court" before a federal court may grant habeas relief. *Id.* at 405, 120 S.Ct. 1495. There are two ways, *Williams* teaches, in which a state court decision will be found to be contrary to Supreme Court precedent:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.... A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent.

*Id.* at 405–6, 120 S.Ct. 1495.

■ There are also two ways in which a state-court decision is an unreasonable application of federal law as determined by the Supreme Court:

> First, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. Second, a state-court decision also involves an unreasonable application of this Court's precedent if the

state court unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Id.* at 407, 120 S.Ct. 1495. The Court pointed out that the inquiry of the federal habeas court into whether a state court has unreasonably applied Supreme Court precedent is an inquiry concerning the objective reasonableness of the state court's action. *See id.* at 410, 120 S.Ct. 1495. The Court, however, declined to offer a specific definition of the term "unreasonable," saying that the term "is a common [one] in the legal world and, accordingly, federal judges are familiar with its meaning." *Id.* The Court did, however, delimit the term by noting that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* Thus, a "federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.*

■ The First Circuit substantially presaged the guiding principles set out in *Williams* in that court's decision in *O'Brien*, 145 F.3d at 23–26. Thus, as the Supreme Court later held in *Williams*, the First Circuit in *O'Brien* held that the "unreasonable application" clause requires the federal habeas court to inquire whether the state court's application of relevant Supreme Court precedent was objectively reasonable. *Id.* at 24. The First Circuit noted, as the Supreme Court later did in *Williams*, that an "unreasonable application" is more than one which the federal habeas court thinks is erroneous. Unlike the Supreme Court in *Williams*, however,

the First Circuit ventured a definition of "unreasonable application:"

> [T]he "unreasonable application" clause does not empower a habeas court to grant the writ merely because it disagrees with the state court's decision, or because, left to its own devices, it would have reached a different result. Rather, for the writ to issue, the state court decision must be so offensive to existing precedent, so devoid of record support, or so arbitrary, as to indicate that it is outside the universe of plausible, credible outcomes.

*O'Brien,* 145 F.3d at 25.

Because *O'Brien* is congruent with *Williams, O'Brien* and its progeny retain their vitality and authority and habeas courts may look to these cases (as well as to *Williams,* of course) for the meaning and proper construction contours of the AEDPA standard. One important analytical tool for assessing the reasonableness of a state court's application of Supreme Court precedent derived from *O'Brien* and its progeny is the following:

> To the extent that inferior federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness *vel non* [under AEDPA] of the state court's treatment of the contested issue.

*Mountjoy,* 245 F.3d at 35–36 (quoting *O'Brien,* 145 F.3d at 25).

With all of the foregoing principles in mind, I turn now to an examination of the relevant Supreme Court precedent on ineffective assistance of counsel.

B. *Supreme Court Precedent on Claims of Ineffective Assistance of Counsel*

The Supreme Court has determined that the Sixth Amendment's guarantee of the right to counsel in criminal cases is a guarantee of the right to the *effective* assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, counsel for a criminal defendant can deprive the defendant of his or her Sixth Amendment right to counsel "by failing to render adequate legal assistance" to the defendant. *Id.* (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)). "The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.*

A habeas petitioner claiming ineffective assistance of counsel must make two showings to succeed. First, the petitioner "must show that counsel's performance was deficient." *Id.* at 687, 104 S.Ct. 2052. Second, the petitioner "must show that the deficient performance prejudiced the defense." *Id.* To establish that his or her counsel's performance was deficient, the petitioner must demonstrate "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The petitioner satisfies this standard if he or she shows that counsel's representation fell below an objective standard of reasonableness under prevailing professional norms. *See id.* at 687–88, 104 S.Ct. 2052. "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.* at 688–89, 104 S.Ct. 2052. Even so, representation of a criminal defendant entails certain basic responsibilities, including consulting with the defendant, keeping him or her informed of important developments and bringing to the representation "such skill and knowl-

edge as would render the trial a reliable, adversarial testing process." *Id.* at 688, 104 S.Ct. 2052. The inquiry in any case where the claim of ineffective assistance of counsel is made, therefore, is whether under all the circumstances of that case, viewed as of the time of counsel's conduct, counsel's performance was reasonable. *See id.* at 690, 104 S.Ct. 2052.

The habeas court owes a high degree of deference to the judgment exercised and decisions made by counsel. *See id.* Habeas review of an ineffective assistance claim is not an occasion for judicial second-guessing of informed judgments. *See id.* Thus, the petitioner must overcome a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that counsel's challenged actions might be considered sound trial strategy. *See id.* at 689, 104 S.Ct. 2052.

To show that deficient performance of counsel prejudiced the defense, a petitioner must demonstrate that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687, 104 S.Ct. 2052. The petitioner, however, need not show by a preponderance of the evidence that counsel's errors determined the outcome of the case. *See id.* at 694, 104 S.Ct. 2052. A habeas petitioner satisfies the prejudice standard if he or she establishes "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

"It is past question that the rule[s] set forth in *Strickland* qualif[y] as 'clearly established Federal law, as determined by the Supreme Court of the United States.' " *Williams,* 529 U.S. at 391, 120 S.Ct. 1495.

The principles set out in *Strickland,* as noted earlier, necessarily require a case-by-case inquiry into counsel's conduct in the context in which that conduct occurred. *See id.; see also Phoenix v. Matesanz,* 233 F.3d 77, 81–82 (1st Cir.2000) ("Specifically, a court must judge the reasonableness of counsel's challenged conduct on the facts of the case at the time of that conduct."). Before turning to that inquiry in the present case, however, it is appropriate that I first set out the framework within which the instant claim is to be assessed. That is, I must first determine whether this case presents a "contrary to" or an "unreasonable application" issue.

## C. *Framework of Analysis of Present Case*

As noted in Part I of this memorandum and order, the highest state court to review the petitioner's claims on the merits was the Massachusetts Appeals Court. In the Appeals Court, the petitioner's appeal from her conviction and the appeal from the denial of her motion for a new trial were consolidated, both appeals raising the same issue: the ineffective assistance of Trial Counsel. Petitioner's Brief to the Appeals Court at 10, 11. The Appeals Court affirmed both the conviction and the order denying the motion for a new trial. *Ouber* at 12.

In its memorandum and order explaining its affirmance of both the conviction and the order denying the petitioner's motion for a new trial, the Appeals Court did not specifically refer to *Strickland.* The court said, however, that "in assessing whether counsel provides ineffective assistance, we have to consider the quality of counsel's behavior and in any event whether in the end the defendant could have been materially hurt by it." *Ouber* at 10–11. In support of this statement, the court relied on a case of the Massachusetts Su-

preme Judicial Court, *Commonwealth v. Saferian*, 366 Mass. 89, 96, 315 N.E.2d 878 (1974).

In *Saferian*, the Supreme Judicial Court set forth a standard for determining ineffective assistance of counsel under the Sixth Amendment in the following terms:

[W]hat is required in the actual process of decision of claims of ineffective assistance of counsel, and what our own decisions have sought to afford, is a discerning examination and appraisal of the specific circumstances of the given case to see whether there has been serious incompetency, inefficiency, or inattention of counsel—behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer—and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defense.

*Id.* at 96, 315 N.E.2d 878 (citations omitted). *Saferian*'s formulation of the performance component—"behavior ... falling measurably below that ... expected from an ordinary fallible lawyer [in the circumstances]"—squares with *Strickland*'s formulation of the performance component, namely that counsel's performance in the circumstances falls below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–88, 104 S.Ct. 2052. Thus, insofar as the standard for measuring the performance of counsel is concerned, the *Saferian* test is consonant with that set out in *Strickland*.[8] The Appeals Court

decision in *Ouber* accordingly identified the governing legal principle with respect to the professional conduct of Trial Counsel. The question then becomes whether the decision constitutes an unreasonable application of the *Strickland* standard for professional conduct. For reasons stated below, I believe it does.

### D.  *Trial Counsel's Performance*

■■■  *Strickland* requires that the performance of counsel be reviewed in the context of all the circumstances that bear on the quality of the representation provided. *See Strickland*, 466 U.S. at 699, 104 S.Ct. 2052. In evaluating the performance of Trial Counsel here, the Appeals Court focused so much of its attention on the competence of the petitioner to evaluate the risks and benefits of testifying at trial that the court failed fully to take account of all the circumstances pertinent to an assessment of Trial Counsel's role as the professional representing the petitioner at trial. The petitioner and Trial Counsel were not professional equals—each fully capable of determining the best course for the petitioner's defense. The analysis of the Appeals Court, however, treats the two as though they were equals—or at least nearly so. In so doing, the Appeals Court was diverted from evaluating the totality of Trial Counsel's conduct in the circumstances, or as the First Circuit has put it, "the totality of the opening and the failure to follow through." *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir.1988).[9]

I will presently address in some detail the manner in which the Appeals Court

---

**8.** I will discuss *infra* the compatibility of the *Saferian* test with *Strickland* with respect to the prejudice component.

**9.** In *Anderson*, the First Circuit held that counsel's failure to call expert witnesses, after he told the jury in his opening that he would call them to support the defense theory, constituted ineffective assistance of counsel under the *Strickland* standard. *See Anderson*, 858

F.2d at 18. The court opined that "there is little more damaging than to fail to produce important evidence that had been promised in the opening, particularly when the opening was delivered 'only the day before.' " *Id.* at 17; *see also Phoenix*, 233 F.3d at 85 (noting in dicta that the failure to fulfill a specific promise to present evidence, made in an opening in a relatively short jury trial, may justify a grant of the writ). *Anderson* is a case with

failed fully to focus on the totality of the circumstances bearing on Trial Counsel's performance. I pause first to point out, however, that the Appeals Court's assessment of the petitioner's competence to make the decision that she would not testify is fraught with assumptions and conclusions that are not supported—and in some cases contradicted—by the record.

As framed by the Appeals Court, there is first the question of whether Trial Counsel fully advised the petitioner of the likely effect on the jury of the petitioner's failure to testify after her testimony had been promised in Trial Counsel's opening. Construing the petitioner's ineffective assistance claim specifically to be a claim that the petitioner was not so advised, the Appeals Court said:

> The decision whether or not to testify is for the defendant herself to make. And a defendant in making the election may look to her counsel for advice.
>
> Here the defendant cannot complain of any ignorance that she would be at risk of serious damage at the hands of the prosecution if she testified. Her specific complaint is that counsel did not tell her about the possible negative reaction of the jury if she stayed silent.
>
> However, it seems likely, and was not denied on the record, that the matter of jury reaction was raised in the discussion at 9 Beth Lane. This would have been natural. Further, the defendant had the experience of two earlier trials and knew her way about. An inference about the jury's possible attitude would not be remote or difficult.

*Ouber* at 10 (citations omitted).

The analysis in the quoted passage has several flaws.

First, the analysis narrows the petitioner's claim to the contention that Trial Counsel did not inform the petitioner about the impact on the jury of her failure to testify. To be sure, the petitioner adverted, in her brief to the Appeals Court, to the failure of Trial Counsel to advise her of the negative impact on the jury of her failure to testify in light of Trial Counsel's opening. This point, however, was made only in a footnote. *See* Petitioner's Brief to the Appeals Court at 15 n. 7. The central argument of the brief was the broader one that Trial Counsel was ineffective because he made four promises to call the petitioner as a witness and failed to do so in a very short trial. *See id.* at 10, 11; *see also* Reply Brief of the Petitioner to the Appeals Court at 1–6. To the extent that the Appeals Court understood the petitioner's claim primarily to be that she was not informed of the likely effect on the jury of the petitioner's failure to testify, the court misconstrued the nature of the petitioner's claim.

Even if the petitioner's claim were merely that Trial Counsel failed to inform her of the impact on the jury of her not testifying, the Appeals Court's analysis is flawed because it makes assumptions about the facts that are not borne out by the record. The Appeals Court speculates that it seems likely that the matter of jury reaction was discussed at 9 Beth Lane, because "this would have been natural." *Ouber* at 10. Presumably, in referring to discussions at 9 Beth Lane, the Appeals Court was referring to the meeting held at 9 Beth Lane following the first day of trial. The only evidence of what occurred at that meeting is set forth in the affidavits of the

facts quite similar to the one at bar and as such provides important guidance in assessing the "reasonableness *vel non*—[under AEDPA] of the state court's treatment of the contested issue" raised in this case. *Mountjoy*, 245 F.3d at 31 (quoting *O'Brien*, 145 F.3d at 25).

petitioner and Trial Counsel. Both of these affidavits were part of the record before the Appeals Court. Neither affidavit states, or even suggests, that there was a discussion of any kind at the meeting concerning the impact on the jury of the failure of the petitioner to testify. Notably, both affidavits state categorically that Trial Counsel did not discuss this matter with the petitioner at any time. *See* Affidavit of Trial Counsel at ¶ 11; Affidavit of the Petitioner at ¶ 12. Thus, the record indicates that, in this case, Trial Counsel *did not do* what it "would have been natural" to do—namely, discuss with the petitioner how the failure of petitioner to testify would likely affect the jury.

The quoted passage also reveals an assumption by the Appeals Court that the petitioner, even without advice of counsel, had the capacity to make a sophisticated decision about whether she should testify at her third trial. That sophistication, the Appeals Court assumed, was based on the petitioner's experience in her earlier trials—experience, the Appeals Court said, that was sufficient to put the petitioner in a position to "know her way about." *Ouber* at 10. The record, of course, shows that the "experience" of the earlier two trials was the *experience of testifying*. While that experience might well inform the petitioner of the jury's reaction when she did testify, it would not necessarily inform her of the jury's reaction if she did not testify.

The principal flaw in the analysis set out in the quoted passage is that the analysis focuses not on the role of Trial Counsel in the determination that the petitioner should not testify, but on the role of the petitioner herself. Of course, as the Appeals Court noted, the ultimate decision whether she should testify was that of the petitioner, but the analysis in the quoted passage does not address what Trial Counsel did to inform that decision. Rather, the analysis focuses on what the petitioner should have known or should have inferred from sources other than Trial Counsel.

The opinion of the Appeals Court addresses only in brief terms the role and conduct of Trial Counsel in the determination that the petitioner should not testify. Saying that it was putting the matter of petitioner's role in the decision not to testify to one side (although, as we shall presently see, the court did not put the matter aside), the Appeals Court concluded that Trial Counsel's failure to call the petitioner "was not an unreasonable strategic move even if the jury might to some degree be affected by it." *Ouber* at 11.

The court acknowledged that "[t]o omit to call a witness who has been promised can, of course, be a serious mistake, but whether it is such in any given case is dependent on the circumstances. . . ." In the circumstances of this case, however, the Appeals Court determined that not calling the defendant as a witness was not a serious mistake and thus not deficient performance by Trial Counsel. The Appeals Court reasoned that if called as a witness, the petitioner would have been undone by the prosecution's cross examination in pursuit of what the court called "an intrinsically weak defense." *Id.* As for the effect on the jury of the unfulfilled promises to present the petitioner as a witness, the court held that "[t]he promise here was not made dramatically or memorably." *Id.* (attempting to distinguish *Anderson*, 858 F.2d at 18–19). Finally, the Appeals Court described, as a "brief and subdued" apology, Trial Counsel's acknowledgment, in his closing, of his failure to call the petitioner. *Id.* The Appeals Court opined that the jury's difficulty in reaching a verdict (as evidenced by its announcement at one point during deliberations that it could not reach a verdict) established that the jury was not "over-

come" by Trial Counsel's promises and his failure to follow through. *See id.* at 11–12. Moreover, the Appeals Court reasoned, the trial judge instructed the jury "against any invidious implications from the defendant's silence." *See id.*

Although the Appeals Court said it had put the matter aside, the court returned, in the concluding paragraph of its opinion, to its original theme: that the decision to testify or not was that of the petitioner, that she was competent to make that decision, and that she likely would have declined to testify even if counsel had advised her that a probable consequence of her not testifying was that the jury would draw inferences adverse to her in light of Trial Counsel's opening promises.

> The defendant appears to be suggesting that she would have decided to testify if the jury point had been put to her specifically. To attach such importance to this matter, taken in comparison with the factor of the prospect of cross examination and rebuttal, seems an artificial retrospective exercise. *The strong likelihood is that she would remain steady in avoiding the witness stand.*

*Id.* at 12. (emphasis added). Thus the Appeals Court's analysis ended where it began—on the role of the petitioner in the determination that she should not testify.

Perhaps because of too great a focus on the conduct and decisionmaking of the petitioner, the Appeals Court unreasonably applied the performance standard of *Strickland* when the court actually turned to an assessment of Trial Counsel's conduct. As noted earlier, the Appeals Court concluded that the failure of Trial Counsel to call the petitioner was "not an unreasonable strategic move." *Ouber* at 11. The problem with this conclusion resides in the Appeals Court's failure to evaluate Trial Counsel's performance in light of the whole record, especially in light of what the record shows as to all the information known and available to Trial Counsel at the time Trial Counsel made his opening. *See Williams,* 529 U.S. at 398, 120 S.Ct. 1495 (holding that state court resolution of an ineffective assistance claim was an unreasonable application of *Strickland* where court failed to evaluate all available evidence relating to prejudice from counsel's deficient performance); *see also Strickland,* 466 U.S. at 691, 104 S.Ct. 2052 ("The court must ... determine whether in light of *all the circumstances* the identified acts or omissions were outside the wide range of professionally competent assistance.") (emphasis added); *Anderson,* 858 F.2d at 17 ("[W]e consider the totality of the opening and the failure to follow through.").

The record reveals no information discovered by Trial Counsel during the course of the third trial that was not available to him at the time he made his opening. In the two trials preceding the trial at issue, Trial Counsel had had the opportunity to assess the strengths and weaknesses of the Commonwealth's case, including the vulnerability *vel non* of its witnesses. Trial Counsel likewise had the opportunity in the two previous trials to assess the strengths and weaknesses of his own case—including the strengths and weaknesses of the petitioner as a witness. The record shows that, up to the point at which the decision was made not to call the petitioner to testify, the third trial proceeded along the same course, with essentially the same evidence, as the two previous trials.

Nothing appears in the record directly to explain why Trial Counsel decided not to call the petitioner to testify.[10] The re-

---

**10.** I note, however, that in his recorded, private meeting with the petitioner before the second trial day, Trial Counsel said to the petitioner: "We're going to try it this way

spondent argues that the Appeals Court reasonably applied the *Strickland* test's required deference to the strategic and tactical decisions made by counsel at trial, because the Appeals Court recognized that Trial Counsel had to weigh the advantages of calling the petitioner as a witness against the likelihood that her appearance as a witness would open the door to the Prosecutor's offering evidence, previously suppressed, concerning drugs and other incriminating evidence found by the police in the petitioner's bedroom during a search of her home after March 8, 1992. *See* Respondent's Memorandum and Opposition to Petition for Writ of Habeas Corpus ("Respondent's Initial Memorandum") at 20; Respondent's Supplemental Memorandum at 14. The Appeals Court's opinion, however, does not specifically address this particular vulnerability of the petitioner. Nevertheless, the respondent has fairly raised the subject, because the matter was raised in the recorded colloquy between the petitioner and Trial Counsel before the second day of trial. That colloquy was reproduced in the Appeal Court's opinion. *Ouber* at 8–9 n. 2.

The argument that the decision not to call the petitioner was a reasonable mid-trial strategic choice of Trial Counsel to preclude damaging cross examination and rebuttal evidence cannot withstand scrutiny. The risk that the Commonwealth would offer evidence of the fruits of the search of petitioner's house if the petitioner were called to testify was known to Trial Counsel at the time he made his opening. That evidence had been offered in rebuttal by the Commonwealth in each of the two previous trials at which Trial Counsel represented the petitioner. *See* Transcript of First Trial (Tr. 1) 408–55; Transcript of Second Trial (Tr. 2), March 20, 1996, at 215–51. In fact, Trial Counsel

mentioned in the colloquy with the petitioner the fact that the once-suppressed evidence had been heard by the jury when the petitioner testified in the previous two trials. That Trial Counsel was conscious, at the time of his opening, of the risk that the petitioner's testimony would create an opening for the damaging evidence is nowhere clearer than in the following passage from the opening, in which Trial Counsel prepared the jury for the damaging evidence:

> You're going to find that after the Defendant's case, there will be introduced evidence of a search of Miss Ouber's home and things that are found there and you will again instructed as to the limited purpose of that evidence by His Honor . . . .

Tr. at 60.

The Appeals Court's opinion does not point to anything in the record—including the possibility of damaging rebuttal evidence—that would have suggested to Trial Counsel *during the trial* that he needed to re-evaluate the four promises he made in his opening to call the petitioner as a witness. In addressing the decision not to call the petitioner as simply the product of a mid-trial strategic revelation, the opinion treats that decision as if it were a matter unconnected to Trial Counsel's opening. In other words, the Appeals Court takes what the First Circuit has called the unacceptable approach of "weighing counsel's choice on the second day as if there had been no opening." *Anderson*, 858 F.2d at 18. But, as the First Circuit concluded in *Anderson*, even if the decision not to call the petitioner was "still wise because of the damaging collateral evidence, it was inexcusable [of Trial Counsel] to have given the matter so little thought at the out-

[i.e., not having the petitioner testify] because       the first two times didn't work." Tr. at 254.

set as to have made the opening promise[s]." *Id.*

In summary, and to repeat, the Appeals Court's treatment of the petitioner's claim of ineffective assistance of counsel is an unreasonable application of the *Strickland* test because the Court's assessment of Trial Counsel's performance failed to consider all of the circumstances that relate to that performance, including what Trial Counsel knew or should have known at the time he made his opening about the strengths and vulnerabilities of the petitioner as a witness.

### E. *Prejudice to Petitioner*

■ As I noted earlier, the Appeals Court's opinion did not look to *Strickland* for the standard to be applied in evaluating the claim of ineffective assistance of counsel. The court instead looked to *Saferian* for that standard. While *Saferian* is consistent with *Strickland* insofar as the performance prong of the standard is concerned, *Saferian* sets forth a standard different from that in *Strickland* with respect to the prejudice prong. Under *Saferian*, prejudice occurs if the deficient performance of counsel "likely deprived the defendant of an otherwise available, substantial ground of defense." 366 Mass. at 96, 315 N.E.2d 878.

The *Strickland* test, however, asks whether counsel's unprofessional errors undermined confidence in the outcome of the trial; that is, whether the errors were so serious that there is a reasonable probability that the result of the proceeding would have been different had the errors not been made. *See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The *Saferian* test is therefore contrary to the *Strickland* test

because the *Saferian* test provides no way of deciding whether the deficient performance of counsel is "sufficiently serious to warrant setting aside the outcome of the proceeding." *Strickland,* 466 U.S. at 693, 104 S.Ct. 2052.

Although the Appeals Court concluded that Trial Counsel's conduct was reasonable, the court nevertheless commented upon the question of prejudice and concluded that the petitioner was not prejudiced by the unfulfilled promises made by Trial Counsel in his opening. Because the court made this determination in reliance on the test for prejudice set forth in *Saferian* rather than that set out in *Strickland,* the court's decision is contrary to clearly established federal law as enunciated by the Supreme Court. Had the court identified and applied properly the *Strickland* standard for prejudice, it would have been obliged to conclude that the petitioner met that standard.

As noted above, in order to establish prejudice, the petitioner need only show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. The court in *Strickland* recognized, however, that in certain situations prejudice may be presumed. *Id.* at 692, 104 S.Ct. 2052. The First Circuit held in *Anderson* that one such circumstance is where counsel in a short trial promises in his opening to present certain critical evidence, then fails to do so. *Anderson,* 858 F.2d at 19;[11] *see also United States v. Gonzalez–Maldonado,* 115 F.3d 9, 15 (1st Cir.1997) (concluding that a defendant suffered prejudice as a matter of law where his counsel did not produce important evi-

---

**11.** The court in *Anderson* held that, in such circumstances, prejudice exists "as·[a] matter of law." I take this formulation to convey the same idea as conveyed by the Supreme Court

in *Strickland* when the court said: "In certain Sixth Amendment contexts, prejudice is presumed." *Strickland,* 466 U.S. at 692, 104 S.Ct. 2052.

dence promised in counsel's opening, even where counsel had been prevented by a ruling of the trial judge from presenting the promised evidence). Using the factually similar *Anderson* and *Gonzalez–Maldonado* cases for guidance, *see Mountjoy*, 245 F.3d at 35–36, I conclude that an Appeals Court decision consistent with *Strickland* would have determined that in the circumstances of the present case prejudice must be presumed.

There is particularly good reason to apply a presumption of prejudice in this case. In his opening, Trial Counsel placed the whole weight of the defense on the testimony of the petitioner. He told the jury that "its ultimate decision in this case" would be made on the basis of the jury's judgment as to the truth and veracity of the petitioner, on the one hand, and Shea on the other. Tr. at 61; *see also id.* at 59–60 ("This case is going to come down to what happened at that car and what your findings are as you listen to the credibility and the testimony of Todd Shea versus what you [sic] findings as you listen to the testimony of Barbara Ouber."). In the course of the trial, Trial Counsel called twenty-four witnesses including a bishop and several other clergymen who testified to the petitioner's reputation for, among other things, truth, honesty and piety. In his closing, Trial Counsel reminded the jury that he had not called the defendant, but once again expounded the theme that the case turned on the credibility of Shea: "Now we still have to go back to the testimony and credibility of Todd Shea." Tr. at 275. He asked the jury whether Shea was credible when Shea asked the petitioner, in her car in the parking lot at Bud's Country Lounge on March 8, 1992, whether the two envelopes contained the required weight and quality as Shea had purchased from the petitioner's brother on previous occasions. Trial Counsel questioned whether Shea used the actual words "weight" and "quality" and then asked rhetorically "Who knows[?]" *Id.* at 272.

Given the opening of Trial Counsel and the large contingent of character witnesses he presented, it would be difficult for the jury not to supply to Trial Counsel's rhetorical "who knows", the answer: "Barbara Ouber knows, and she is a woman with a strong reputation for truth and honesty." In the absence of the petitioner's testimony, the jury could only have concluded that her truthful testimony would not have contradicted the testimony of Shea. Thus, because Trial Counsel's opening made it so, petitioner's testimony "went to the vitals of [petitioner's defense]." *Anderson*, 858 F.2d at 18.

But there is more than presumed prejudice in the record in this case. The record also shows a reasonable probability that, in the absence of Trial Counsel's errors, the outcome of the proceeding would have been different. In her affidavit, the petitioner indicates that her testimony would have contradicted that of Shea: "I wanted to tell the jury in my own words that I had no knowledge of a drug transaction. I also believed that there was no other way to effectively contradict Mr. Shea's version of what occurred in the car as Mr. Shea and I were the only ones there." Petitioner's Affidavit at 6. In the two previous trials, Trial Counsel delivered on his promise to produce the petitioner as a witness. See Tr. 1 at 466–490; Tr. 2, Vol. 5 at 2–24; Petitioner's Affidavit at ¶¶ 6–7; Trial Counsel's Affidavit at ¶¶ 4, 7–9. In those trials, the petitioner's testimony indeed had contradicted the testimony of Shea. Each of the two previous trials ended in mistrials, and in the third trial, the jury at one point announced that it was deadlocked in its deliberations. *See Ouber* at 11–12. To be sure, a mistrial is not a determination that the petitioner was not guilty of the charges against her. Still,

the outcome in the two earlier trials, and the fact that there was a deadlocked jury at one point in the third trial, constitute a sufficient showing of a reasonable probability that had Trial Counsel not made the error of making four promises to call the petitioner as a witness in his opening and failing to deliver on those promises, the petitioner would not have been convicted.

## CONCLUSION

For the foregoing reasons, the writ shall issue unless the Commonwealth affords the petitioner a new trial within seventy days of this order.

SO ORDERED.